```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: 3/31/21
```

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

Jose Vasquez, *et al.*,

                Plaintiffs,

       –v–

NS Luxury Limousine Service, Ltd., *et al.*,

             Defendants.

---

18-cv-10219 (AJN)

MEMORANDUM
OPINION & ORDER

ALISON J. NATHAN, District Judge:

Plaintiffs bring claims under federal and state labor laws against their former employer. Plaintiffs moved for partial summary judgment and Defendants cross-moved for summary judgment. For the reasons that follow, Plaintiffs' motion is GRANTED and Defendants' motion is DENIED.

## I.     BACKGROUND

### A.  Factual Background

The following facts are drawn from the parties Rule 56.1 statements and are undisputed unless otherwise stated. Defendants NS Luxury Limousine Service, Ltd. and JC Transportation Inc. are New York corporations owned and operated by Defendant Phelix Ceballos. Dkt. No. 95 ¶¶ 1-4. The companies ("Defendant Car Service") were operated jointly as a car service business out of the same premises. Dkt. No. 90-1 ¶¶ 3-6. Defendant Car Service owned a fleet of vehicles, including sedans and SUVs. Dkt. No. 95 ¶¶ 5-6. In addition to providing car services available for hire to the general public, Defendants also provided private chauffeur services to

1

specific customers.  Dkt. No. 95 ¶ 3.  In the years 2015 through 2018, Defendant Car Service had gross annual revenues exceeding $500,000.  Dkt. No. 90-1 ¶¶ 7-8.

Plaintiffs Jose Vasquez and Fernando Martinez were hired as drivers for Defendant Car Service by Defendant Ceballos, who is the sole owner of Defendant Car Service and operates the business.  Dkt. No. 90-1 ¶¶ 17-20.  Prior to the Plaintiffs' employment, both had obtained relevant licenses using their own funds.  Dkt. No. 95 ¶¶ 47, 52.  Plaintiffs, and all other drivers hired to work at Defendant Car Service, had the option of receiving hourly compensation or working on commission.  Dkt. No. 95 ¶ 11.  All drivers for the company received IRS 1099 forms.  Dkt. No. 95 ¶¶ 10, 74.  Drivers were required to wear black suits while driving.  *Id.* at ¶ 13.

At some point after they were hired by Defendant Car Service, Plaintiffs were assigned to work as personal drivers for two families in Westchester, New York.  In September of 2015, Plaintiff Vasquez was assigned to be a chauffeur for the Korngold family.  Dkt. No. 90-1 ¶ 22. In January of 2017, Plaintiff Martinez began as a chauffeur for the Levy family.  Dkt. No. 90-1 ¶ 31.  The arrangement was that the families provided the car and paid expenses, and Defendants supplied the driver.  Dkt. No. 90-1 ¶¶ 24-25, 33, 34.  Plaintiffs were not required to wear the black suit that Defendant Car Service drivers usually wore, but instead were granted permission from the families to dress casually.  Dkt. No. 95 ¶¶ 34, 70.  Dkt. No. 95 ¶ 57.

The families paid Defendants a flat rate of $1,500 a week for this service, Dkt. No. 90-1 ¶¶ 26, 35; Dkt. No. 95 ¶¶ 22, 56, and Defendants in turn paid Plaintiffs a flat weekly amount of $1,000, Dkt. No. 90-1 ¶¶ 51-53, 59-60.  The parties dispute whether this was a "salary" or a "commission."  Dkt. No. 95 ¶ 25.  After Plaintiff Vasquez complained to the Defendants about the number of hours he was working, his pay was raised to $1,100 per week.  *Id.*  Neither

Plaintiff received paystubs.  Dkt. No. 90-1 ¶¶ 57, 64.  Plaintiffs were not paid for vacation time.

Dkt. No. 95 ¶¶ 33, 67.  Plaintiff Vasquez received annual bonuses directly from the Korngold

family.  Dkt. No. 95 ¶ 35.

Defendant Ceballos was aware of the general requirement that businesses must pay

employees overtime compensation and did not pay either Plaintiff overtime at any point.  Dkt.

No. 90-1 ¶ 54, 61.  In the past, Defendants were required to pay money to the New York State

Department of Labor as the result of a complaint filed by an employee about not being paid

overtime, and also settled a lawsuit with an employee regarding payment issues.  Dkt. No. 90-1

¶¶ 68, 70.  Defendants did not change their company policies after either of these events.  Dkt.

No. 90-1 ¶¶ 69, 71.  Defendants have not consulted with anyone regarding how to classify and

pay employees. Dkt. No. 90-1¶ 73.

The parties agree that Plaintiffs were to drive for the families for a regular schedule of

Monday through Friday, 10 hours a day, starting around 7:30 A.M. and subject to change by the

families.  Dkt. No. 90-1 ¶¶ 27, 36.  Plaintiffs contend that at some point the families increased

the number of hours that Plaintiffs worked and that Plaintiffs were required to be available

outside of these hours.  Dkt. No. 95 ¶¶ 18, 19, 55.   Plaintiff Vasquez maintains that he started

out working 42 hours a week for the Korngold family but that after six months he began working

52 hours a week, and six months after that, 60 hours a week.  Dkt. No. 90-1 ¶ 44-46.   Plaintiff

Martinez maintains he worked 60 hours a week for the Levy family.  Dkt. No. 90-1 ¶ 49.

Plaintiffs maintain that Defendants were aware that Plaintiffs were working more than 40 hours a

week, which Defendants contest.  Dkt. No. 90-1 ¶¶ 43, 48.

Defendants dispute that Plaintiffs worked more than 40 hours a week.  Dkt. No. 90-1 ¶¶

43, 48.  As to Plaintiff Vasquez, Defendants only evidence for disputing that he worked more

than 40 hours a week is a statement from Defendant Ceballos at his deposition that he told Plaintiff Vasquez when he began working for the Korngold family that had to be available for 10 hours a day.  Dkt. No. 86-8, Tr. 64.  At a later point in the deposition, Defendant Ceballos was asked "[d]id there come a point where Mr. Vasquez was driving more hours than [40-43 a week] for the Korngolds?" to which Defendant Ceballos responded "He is the one who knows . . . I know he told me he was doing more and he asked me to pay him something extra which I did." *Id.* at Tr. 70.  In disputing that Plaintiff Martinez worked more than 40 hours a week, Defendants point only to a statement from Defendant Ceballos deposition that "[o]nce [Plaintiff Martinez] told me he was working extra hours and I told to tell [Mr. Levy]. . . [Mr. Levy] tell him and tell me that he was going to use him less and after that I didn't hear from [Plaintiff Martinez] for a while." *Id.* at Tr. 116.

Defendants did not provide a time clock or any other method for employees to track the time that they worked as a general matter, and Defendants did not maintain records of the hours that Plaintiffs worked for the families nor did Defendants ask Plaintiffs to keep track of those hours.  Dkt. No. 90-1 ¶¶ 38-42.  There are therefore no records of the hours that Plaintiffs drove for the families.

The parties also dispute whether Plaintiffs drove exclusively for the families during this period or if they performed other driving-related work for Defendant Car Service as well.  Dkt. No. 90-1 ¶¶ 22, 31.  Plaintiff Vasquez maintains that, during the period when he was a chauffeur for the Korngold's, he drove for them exclusively.  Dkt. No. 90-1 ¶ 22.  Defendants dispute this fact, pointing only to a portion of Plaintiff Vasquez's deposition testimony where he stated his services were provided "exclusive to the Korngolds" but when asked "[w]ere you ever a replacement driver during this time," he responded "[i]t could have happened, but very few

times." Dkt. No. 90-14 at 77. Plaintiff Martinez also maintains that he worked exclusively as a chauffeur for the Levy's during the relevant time period. Dkt. No. 90-1 ¶ 31. Defendants dispute this fact by pointing to his deposition testimony in which he stated that, during the hours when he was supposed to be available to drive the Levy's but they did not need him, that Defendant Ceballos told him that he needed to come drive for Defendant Car Service, and he did. Dkt. No. 90-15 at 71-72. Plaintiffs admit that on occasion Plaintiff Martinez would work for Defendants in one of Defendant's vehicles, but claim it occurred "rarely." Dkt. No. 95 ¶ 65.

While Plaintiffs were working for the families, they communicated with the families both directly and through Defendants. Dkt. No. 95 ¶¶ 29-32. The Levy family sent daily schedules to Defendants via email, which Defendants would then forward to Plaintiff Martinez. Dkt. No. 95 at ¶ 59. At some point, the Korngold family ceased communicating with Plaintiff Vasquez through Defendants and communicated with Plaintiff Vasquez directly, and on at least one occasion, Mr. Korngold discussed hiring Plaintiff Vasquez directly. Dkt. No. 95 ¶ 36, 37.

In 2018, Plaintiffs working relationships with Defendants ended. Dkt. No. 90-1 ¶ 23, 32. In February 2018, Plaintiff Martinez incorporated his own business and in April 2018 quit his position with Defendants. Dkt. No. 95 ¶ 74-75. He then continued driving for the Levy family. *Id.* at ¶ 76. Sometime around August of 2018, Plaintiff Vasquez planned a three-week vacation and, when he returned, found that another driver had been assigned to drive for the Korngold's. Dkt. No. ¶¶ 43-45. The parties dispute whether Mr. Korngold or Defendants made the decision to let Plaintiff Vasquez go. Plaintiffs claim that Mr. Korngold wanted to keep Plaintiff Vasquez as the family's chauffeur and that it was Defendants who terminated his position, and Defendants argue the opposite. *Id.*

## B. Procedural Background

5

Plaintiffs filed a Complaint in this Court on November 2, 2018.  Dkt. No. 1.  They bring claims against Defendants for failing to pay them overtime as required under the Fair Labor Standard Act (Count I) and New York Labor Law (Count II), as well as claims for Defendants' alleged failure to provide certain wage notices as required under the Wage Theft Prevention Act (Count III).  *Id.*  Plaintiffs seek liquidated damages under both FLSA and NYLL, statutory damages for the alleged violations of the New York Wage Theft Prevention Act, a declaratory judgment, injunction, punitive damages, back pay, pre- and post- judgment interest, and attorneys' fees and costs.  *Id.*

The case proceeded to discovery, which was completed in December of 2019.  Dkt. No. 59.  On July 17, 2020, Plaintiffs filed a motion for partial summary judgment.  Dkt. No. 83.  In that motion, Plaintiffs argue that the Court should rule for them as a matter of law on their FLSA and NYLL overtime claims and their WTPA claims, and that Plaintiffs are entitled to liquidated damages, prejudgment interest on their NYLL claims, and the award of attorney's fees and costs. Dkt. No. 85. Defendants filed a cross-motion for summary judgment on September 4, 2020, arguing that Plaintiffs' FLSA and NYLL overtime claims fail as a matter of law, that the Court should decline supplemental jurisdiction over the remaining state law claims, and that a two-year statute of limitations applies.  Dkt. No. 90-16.   Those motions are now fully briefed.

## II.    LEGAL STANDARD

Summary judgment shall be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The court must "construe the facts in the light most favorable to the non-moving party and resolve all ambiguities and draw all reasonable inferences against the movant." *Delaney v. Bank of Am. Corp.*, 766 F.3d 163, 167 (2d Cir. 2014) (internal quotation marks and alterations

omitted).  If the court determines that "the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial" and summary judgment should be granted to the moving party.  *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (internal quotation marks and citation omitted).

It is the initial burden of the movant to present evidence on each material element of its claim or defense and demonstrate that he is entitled to relief as a matter of law.  *See Vt. Teddy Bear Co. v. 1-800 Beargram Co.*, 373 F.3d 241, 244 (2d Cir. 2004).  There is a genuine issue of material fact if a reasonable jury could decide in the non-moving party's favor.  *See Nabisco, Inc. v. Warner-Lambert Co.*, 220 F.3d 43, 45 (2d Cir. 2000).  The court "is not to weigh the evidence but is instead required to view the evidence in the light most favorable to the party opposing summary judgment, to draw all reasonable inferences in favor of that party, and to eschew credibility assessments." *Amnesty Am. v. Town of W. Hartford*, 361 F.3d 113, 122 (2d Cir. 2004) (internal quotation marks omitted).

To survive a summary judgment motion, the non-moving party "must come forward with specific evidence demonstrating the existence of a genuine dispute of material fact." *Brown v. Eli Lilly & Co.*, 654 F.3d 347, 358 (2d Cir. 2011).  In doing so, the non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts ... and may not rely on conclusory allegations or unsubstantiated speculation." *Id.* (internal quotation marks and citation omitted).  When there are cross-motions for summary judgment, "each party's motion must be examined on its own merits, and in each case all reasonable inferences must be drawn against the party whose motion is under consideration." *Morales v. Quintel Entm't, Inc.*, 249 F.3d 115, 121 (2d Cir. 2001).

## III.   OVERTIME CLAIMS

Both parties seek summary judgment on Plaintiffs' claims for overtime under the FLSA and NYLL.  Defendants admit that they never paid either Plaintiff overtime.  Nonetheless, Defendants argue that they are not liable under FLSA or NYLL because (1) Plaintiffs were independent contractors, not employees, (2) even if Plaintiffs were employees, Defendants are not covered "employers" for the purposes of FLSA, and (3) Plaintiffs were exempt from overtime pay under the taxicab exemptions of the FLSA and NYLL.   Defendants also maintain that, even if Defendant Car Service is liable, Defendant Ceballos was not Plaintiffs' employer.

For the reasons that follow, the Court concludes as a matter of law that Plaintiffs have established at least NYLL violations by all Defendants and therefore grants summary judgment in favor of the Plaintiffs on their overtime claims.

## A.  Defendants employed Plaintiffs for the purposes of the FLSA and the NYLL

In order "[t]o be held liable under the FLSA, a person must be an 'employer.'"  *Herman v. RSR Sec. Servs. Ltd*., 172 F.3d 132, 139 (2d Cir. 1999).  The same is true for the NYLL, and courts apply the same definition of "employer" under both statutes.  *See Allende v. PS Brother Gourmet, Inc*., No. 11CIV5427AJNKNF, 2013 WL 11327098, at *2 (S.D.N.Y. Feb. 1, 2013); *Jiao v. Shi Ya Chen*, No. 03 Civ. 0165(DF), 2007 WL 4944767, at *9 n. 12 (S.D.N.Y. Mar. 30, 2007).  As such, the analysis that follows applies to both claims.

An "employer" is "any person acting directly or indirectly in the interest of an employer in relation to an employee," and an "employee" is "any individual employed by an employer." 29 U.S.C. § 203(d), (e)(1).   Supreme Court precedent instructs that the "determination of whether an employer-employee relationship exists for purposes of the FLSA should be grounded in economic reality rather than technical concepts." *Barfield v. New York City Health & Hosps. Corp*., 537 F.3d 132, 141 (2d Cir. 2008) (citing *Goldberg v. Whitaker House Coop., Inc.,* 366

U.S. 28, 33 (1961)).   And when analyzing the economic realities of the relationship, courts should not depend on "isolated factors but rather upon the circumstances of the whole activity." *Id.* (citing *Rutherford Food Corp. v. McComb*, 331 U.S. 722, 730 (1947)).

In the context of cases like this one, which require "distinguishing employees from independent contractors," the Second Circuit has applied a multi-factor test to determine whether an employee-employer relationship exists, including "(1) the degree of control exercised by the employer over the workers, (2) the workers' opportunity for profit or loss and their investment in the business, (3) the degree of skill and independent initiative required to perform the work, (4) the permanence or duration of the working relationship, and (5) the extent to which the work is an integral part of the employer's business."  *Zheng v. Liberty Apparel Co. Inc.*, 355 F.3d 61, 67 (2d Cir. 2003) (citing *Brock v. Superior Care, Inc.*, 840 F.2d 1054 (2d Cir. 1988)).  While "[t]he existence and degree of each factor is a question of fact," the "legal conclusion to be drawn from those facts—whether workers are employees or independent contractors—is a question of law." *Brock.*, 840 F.2d at 1059.

### 1.  Degree of Control

Relying on undisputed facts, the Court begins by assessing the degree of control that Defendants exercised over Plaintiffs' work.  Though Plaintiffs were driving full-time for the families, both to and from the families' homes and in the families' vehicles, Defendants still exercised significant control over Plaintiffs.  In assessing the degree of control, the fact "that an employer does not exercise control continuously or consistently 'does not diminish the significance of its existence.'" *Hart v. Rick's Cabaret Int'l, Inc.*, 967 F. Supp. 2d 901, 912 (S.D.N.Y. 2013) (*Irizarry v. Catsimatidis*, 722 F.3d 99, 111 (2d Cir. 2013)).  An "employer does not need to look over his workers' shoulders every day in order to exercise control." *Ansoumana*

*v. Gristede's Operating Corp.*, 255 F. Supp. 2d 184, 190 (S.D.N.Y. 2003).  Instead, the Court

looks to factors such as who was the ultimate decision maker on the main conditions of

Plaintiffs' work, such as duties and compensation.  *See Brock*, 840 F.2d at 1061 (assessing

whether the putative employer "exercises substantial control over the manner and conditions of

their work.").

      Most importantly, Defendants paid Plaintiffs.  It is a telltale sign that a worker is an

employee when instead of "selling their [services] on the market for whatever price they can

command" they are "regimented under one organization," providing services as "the

organization desires and receiving the compensation the organization dictates."  *Goldberg v.*

*Whitaker House Co-op., Inc.,* 366 U.S. 28, 32 (1961).  While the customers, i.e. the families,

ultimately decided how much they were willing to pay Defendants for the car service, it is

undisputed Defendants were the ones who decided how much to pay Plaintiffs.  Plaintiff

Vasquez received a raise only after complaining to Defendants about his salary, and Defendants

decided what additional amount he would be paid.

      Additionally, Defendants assigned Plaintiffs' work.  It does not matter that the hours

Plaintiffs spent driving were dictated by the needs of the customer.  The undisputed facts

demonstrate that Defendants alone negotiated the terms of chauffeur agreement with the families

and Defendants then assigned each Plaintiff to those jobs.[1]  Because the "Company told plaintiff

whom to drive and, when he was designated to a specific [customer], his schedule was

determined by the [that customer]," each Plaintiff therefore had "little discretion over when and

how long to work." *Gustafson v. Bell Atl. Corp.*, 171 F. Supp. 2d 311, 325 (S.D.N.Y. 2001)

---

[1] Defendants point out that on at least one occasion, Mr. Korngold even discussed hiring Plaintiff Vasquez directly.
However, the fact that Mr. Korngold and Plaintiff had this conversation about that *potential* arrangement (which
never came to fruition), is strong evidence that in their existing arrangement, Plaintiff Vasquez was not working for
the Korngold's as an independent contractor but instead was an employee of Defendants.

(determining that chauffeurs were employees and not independent contractors for the purposes of FLSA).  In contrast, if it were the case that Plaintiffs had been able to solicit and accept assignments "on whatever days and at whatever times they pleased, and they were under no obligation to accept a particular job," then Plaintiffs would be more likely to fit into a similar category of drivers who work as independent contractors.  *Saleem v. Corp. Transp. Grp., Ltd.*, 52 F. Supp. 3d 526, 537 (S.D.N.Y. 2014) (determining that drivers for a "black car" service were independent contractors where drivers "decide[d] for themselves" when to provide services). But instead, the record demonstrates that Plaintiffs merely did the work that was assigned to them by Defendants (and only by Defendants).  *See Campos v. Zopounidis*, No. 3:09-CV-1138 VLB, 2011 WL 2971298, at *5 (D. Conn. July 20, 2011) (Delivery worker was an employee where he "delivered food only for and at the direction of Pappa's Pizzeria.").

While Defendants emphasize that Plaintiffs did have the ability to communicate directly with the families regarding some aspects of their employment, including small practical matters such as if they were running late or on-the-spot changes to the daily schedule, those instances do not suggest that Plaintiffs had any meaningful control over the terms of their employment. Rather, those are the necessary and ordinary types of communications required in the provision of driving services to a customer, whether one is an employee or an independent contractor.

In sum, under these circumstances, where a company is primarily responsible for assigning work and dictating compensation, the "degree of control" is considered to be high and weighs heavily towards a finding of an employer-employee relationship.  *See Ansoumana*, 255 F. Supp. 2d at 190 (S.D.N.Y. 2003) (determining that the defendants, who assigned delivery-worker plaintiffs to various pharmacies, were not just a "placement agency" but in fact were the plaintiff's employers because they "controlled their hiring, firing, transfer and pay.").  *See also*

*Ethelberth v. Choice Sec. Co.,* 91 F. Supp. 3d 339, 351 (E.D.N.Y. 2015) (determining that security guards were employees in part because they were "hired and supervised the company's security guards, including determining their pay [and] assigning them to work sites . . .").

### 2.  Opportunity for Profit or Loss and Investment in the Business

Next, the Court considers whether Plaintiffs had an opportunity for profit (or loss) from their efforts and the degree to which they made investments in their work.

"The more tools that an individual provides or owns himself, the more likely he will be considered an independent contractor." *Leach v. Kaykov*, No. 07-CV-4060-KAM-VVP, 2011 WL 1240022, at *20 (E.D.N.Y. Mar. 30, 2011).  Other than obtaining the necessary licenses to drive in Westchester, New York, the undisputed facts show that Plaintiff's did not invest substantially in their work.  They used the families' cars and the families paid all necessary expenses.  *Cf. Saleem*, 52 F. Supp. 3d at 540 (finding drivers who "spent money buying or renting their cars, maintaining their cars, buying gasoline, paying the costs associated with their [] licenses, and procuring insurance," to be independent contractors.); *Browning v. Ceva Freight*, LLC, 885 F. Supp. 2d 590, 608 (E.D.N.Y. 2012) (finding that the fact that drivers "utilized their own vehicles and all of their own tools and supplies . . .  supports a finding of independent contractor status").

Additionally, Plaintiffs had very little opportunity for profit or loss.  For compensation, Plaintiffs received a flat weekly payment by Defendants.  *Cf. Arena v. Delux Transp. Servs., Inc.,* 3 F. Supp. 3d 1, 12 (E.D.N.Y. 2014) (independent contractor driver controlled "how much overall money he earned as a result of the number of calls he took and fares he earned."); *Saleem*, 52 F. Supp. 3d at 538 (independent contractor drivers were paid by the trip and some had "their own credit card merchant accounts to process payments from private clients.").  And

because they worked *only* for Defendants, they were "precluded from other income." *Schwind v. EW & Assocs., Inc.*, 357 F. Supp. 2d 691, 701 (S.D.N.Y. 2005).  *Cf. Saleem*, 52 F. Supp. 3d at 538 (finding it "indicative of Defendants' limited control over the drivers[,]" and thus the drivers' independent contractor status, that "the drivers were free to—and frequently did—work for other car services and provide transportation to private customers.").

Defendants point out that Plaintiff Vasquez received an annual bonus from the Korngold family.  While this fact in isolation might point towards independent contractor, it does not outweigh the fact that Plaintiffs received a flat-rate weekly salary from Defendants that was not dependent on how much or how well they performed in their duties.  Moreover, the fact that a worker who performs well in their job may receive tips and extra benefits from customers or their employer does not necessarily make them an independent contractor.  *See Hart*, 967 F. Supp. 2d at 913 (listing cases concluding that exotic dancers are ordinarily classified as employees instead of independent contractors for the purposes of FLSA despite the tips they receive).

All in all, the Court concludes that this factor tips slightly in favor of an employee relationship or is at best neutral.

### 3. Degree of Skill and Independent Initiative Required

The Court next assesses whether or not Plaintiffs were skilled professionals who relied on independent initiative to market their services.

Working as a "chauffeur require[s] no specialized skill or initiative," which tends to suggest a chauffeur is "an employee rather than an independent contractor."  *See Gustafson v. Bell Atl. Corp.*, 171 F. Supp. 2d at 326.  *See also Saleem*, 52 F. Supp. 3d at 541("[D]riving is not a "specialized skill[.]'").  Defendants point to the fact that both Plaintiffs had to obtain driver's

licenses in order to work as drivers, and indeed driving licenses that were more specialized than

ones Plaintiffs might have otherwise obtained for personal use, such as the Taxi & Limousine

license obtained by Plaintiff Martinez.  However, the fact that a worker needs to obtain some

skill or qualifications for a job does not automatically make them an independent contractor.  To

the contrary, many employment positions require skill and "[a] variety of skilled workers who do

not exercise significant initiative in locating work opportunities have been held to be employees

under the FLSA." *Brock v. Superior Care, Inc*., 840 F.2d at 1060 (citing cases discussing

welders, tailors, etc.).  The undisputed record in this case demonstrates that, while Plaintiffs

needed to be able to drive and obtained licenses to drive in the area, their duties as chauffeurs

required no highly specialized skills or training.  Moreover, as discussed above, Plaintiffs were

assigned by Defendants to work for the families and did not use any independent initiative to

obtain work.  This factor points towards a determination that Plaintiffs were employees.

### 4.  Permanence or Duration of the Working Relationship

The Court next assesses the length and nature of the relationship between Plaintiffs and

Defendants.  A worker is more likely to be an independent contractor if they are "transient" and

"typically work for several employers." *Brock*, 840 F.2d at 1060.  *See also Saleem*, 52 F. Supp.

3d at 542 ("Generally speaking, independent contractors often have fixed employment periods

and transfer from place to place as particular work is offered to them, whereas employees usually

work for only one employer and such relationship is continuous and of indefinite duration.")

(quoting *Baker v. Flint Eng'g & Const. Co*., 137 F.3d 1436, 1442 (10th Cir.1998)).

Although the record does not establish when Plaintiffs were first hired, Plaintiff Vasquez

was the Korngold's chauffeur for about three years and Plaintiff Martinez was the Levy's

chauffeur for about a year. It is undisputed that the Plaintiffs worked full-time in these positions

14

during these years.  The continuous, long-term nature of the work tends to suggest that Plaintiffs were employees and not independent contractors.  *See Ethelberth*, 91 F. Supp. 3d at 351 (determining that in part because "[t]he record shows that [security guard] worked for [Defendant], on essentially a full-time basis, from his hiring in December 2007 through June 2010," the security guard was an employee).

### 5.   Extent to which Work is an Integral Part of the Employer's Business

Finally, the Court considers whether Plaintiffs were a critical part of Defendants' business, or whether they were less integral to the operation, which would suggest that they were independent contractors. *See Brock*, 840 F.2d at 1059 (holding that "nurses constituted the most integral part of [defendant's] business, which is to provide health care personnel on request" and that this "weigh[s] heavily in favor" of determining that the nurses were employees).  Drivers are undoubtedly an integral part of any kind of car service.  *Saleem*, 52 F. Supp. 3d at 543 ("Defendants' business could not function without drivers, and Defendants wisely do not argue to the contrary").  The fact that Plaintiffs were doing the primary work of the company tends to suggest that they were employees of Defendants.

\* \* \*

Relying upon undisputed facts, all of the *Brock* factors either point towards a conclusion that Plaintiffs were not independent contractors or are neutral.  Considering all of the factors, the Court determines as a matter of law that Plaintiffs were Defendant's employees during the relevant time period for the purposes of both the FLSA and NYLL.

### B.  Defendant Ceballos is a Joint Employer

Having concluded that Plaintiffs were employed by Defendant Car Service, the Court must next address whether the individual Defendant, Defendant Ceballos, is a joint employer and

therefore also potentially liable under the FLSA and NYLL.  "Under certain circumstances, the FLSA permits 'an individual within a company that . . . employs a worker [to be held] personally liable for damages as that worker's 'employer.'" *Inclan v. New York Hosp. Grp., Inc.*, 95 F. Supp. 3d 490, 507 (S.D.N.Y. 2015) (citing *Irizarry v. Catsimatidis*, 722 F.3d 99, 105 (2d Cir.2013)).  To determine whether Defendant Ceballos was an employer, the Court begins with the key factors such as if he "(1) had the power to hire and fire the employees, (2) supervised and controlled employee work schedules or conditions of employment, (3) determined the rate and method of payment, and (4) maintained employment records."  *Id.* (citing *Herman*, 172 F.3d at 139).  *See also Zheng*, 355 F.3d at 71 (stating that courts are not limited to these factors and should consider more broadly any and all factors "relevant to its assessment of the economic realities" in determining if defendants are joint employers).  The same analysis applies under the NYLL.  *See Hart*, 967 F. Supp. 2d at 940 ("Courts in this District have regularly applied the same tests to determine, under the FLSA and the NYLL, whether entities were joint employers.").

Relying on the undisputed facts in the record, the Court determines that Defendant Ceballos was Plaintiffs' employer under FLSA.  Defendants admit that Defendant Ceballos 100% owned, operated, and presided over Defendant Car Service, that he was involved in the "day-to-day operations" of the business and that he had "sole authority to hire and fire employees" and to "set wages" and "schedules" for employees.  Dkt. No. 90-1 ¶¶ 10-15.  Moreover, Defendants do not dispute that Defendant Ceballos made the decision to hire Plaintiffs, set their rates and methods of pay, set their schedules, and assigned them to work for the families.  *Id.* at ¶¶ 17-21.  Defendant Ceballos was at the highest "level of . . . corporate hierarchy" and possessed the ultimate power over the business and its employees, including

16

Plaintiffs. *Irizarry*, 722 F.3d at 106 (assessing the degree of power an individual possesses over the company and "to what extent and with what frequency [the] individual actually use[d] the power he or she possesses over employees."). Therefore, based on the undisputed facts in the record, the "economic reality" is that Defendant Ceballos exercised near total control over Plaintiff's employment. *Zheng*, 355 F.3d at 71. The Court therefore concludes as a matter of law that Defendant Ceballos and Defendant Car Service were joint employers of Plaintiffs.

### C. Defendants are Qualifying Employers under FLSA

Although the Court determines that Defendants were Plaintiffs' employers, for Plaintiffs' FLSA claim, the overtime requirements only apply to employers who have the requisite connections to interstate commerce as defined by the Act. To fall within the statute's mandate, an employer must be "1) 'engaged in commerce or in the production of goods for commerce,' or 2) 'employed in an enterprise engaged in commerce or in the production of goods for commerce.'" *Jacobs v. New York Foundling Hosp.*, 577 F.3d 93, 96 (2d Cir. 2009) (quoting 29 U.S.C. § 207(a)(1)). For this latter option (referred to as "enterprise coverage"), the requirement that an enterprise be "engaged in commerce" applies when the employer "has employees engaged in commerce or in the production of goods for commerce, or that has employees handling, selling, or otherwise working on goods or materials that have been moved in or produced for commerce by any person" and "is an enterprise whose annual gross volume of sales made or business done is not less than $500,000." 29 U.S.C. § 203(s)(1)(A). The word "commerce" in this provision refers to "interstate commerce." *Archie v. Grand Cent. ''ship, Inc.*, 997 F. Supp. 504, 528 (S.D.N.Y. 1998) (citing 29 U.S.C. § 203(b))).

These two elements of enterprise coverage are satisfied here. As Defendants do not dispute, Defendant Car Service had gross annual revenues exceeding $500,000 in the years 2015

through 2018.  Moreover, Defendants admit that they are a car service that owns a fleet of cars and hired drivers to drive them.  Cars are goods that are produced for and move within interstate commerce.  *See Velez v. Vassallo*, 203 F. Supp. 2d 312, 329 (S.D.N.Y. 2002) ("Defendants' employees handled cars that were brought to public parking garages in New York City; such cars surely epitomize 'goods or materials that have been moved in or produced for' interstate commerce" under section 203 of FLSA).  Therefore, Defendants had employees who were "handling . . . goods or materials that have been moved in or produced for" interstate commerce as required by Section 203 of FLSA.  29 U.S.C. § 203.

Defendants' argument to the contrary is that Section 203 requires that the products in interstate commerce be "consumed" in the operation of employer's business, which they have never done.  This is incorrect.  The word "consumed" is not in the text of Section 203(s)(1) of FLSA.  Rather, other courts, such as those cited by Defendants, have found that where goods or materials that were moved in or produced for interstate commerce were "consumed" in the course of an employer's business, its employees had therefore "handled, sold, or otherwise worked on" those products, and thus those employers were included in Section 203's purview.  *See, e.g., Locke v. St. Augustine's Episcopal Church,* 690 F. Supp 2d 77, 88-89 (E.D.N.Y. 2010).  But by its plain terms, Section 203 of FLSA includes the "production . . . handling, selling, or otherwise working on" goods in interstate commerce by employees, and Defendants do not attempt to argue that their employees do not handle cars or that cars are not goods moved in or produced for interstate commerce.  The Court therefore concludes that there is no genuine dispute of material fact that these elements are met and concludes as a matter of law that Defendants are an "enterprise engaged in commerce or in the production of goods for commerce" under FLSA.  29 U.S.C. § 203(s)(1).

**D. Plaintiffs are not exempt under the taxicab exemptions of FLSA & NYLL**

While the Court concludes as a matter of law that Defendants were Plaintiffs' employers for the purposes of the overtime requirements of the FLSA and NYLL, the inquiry is not over. Even if an employer would otherwise be required to pay overtime, the FLSA and the NYLL exempt a number of categories of employees from overtime wages. *See* 29 U.S.C. § 213; N.Y. Lab. Law § 651(5).   One such exemption under the FLSA is that overtime need not be paid to "any driver employed by an employer engaged in the business of operating taxicabs."  29 U.S.C. § 213(b)(17).  The NYLL exempts any "driver engaged in operating a taxicab." N.Y. Lab. Law § 651(5)(d).

In *Munoz-Gonzalez v. D.L.C. Limousine Serv., Inc*., the Second Circuit explained that a "taxicab" for the purposes of the FLSA exemption is: "(1) a chauffeured passenger vehicle; (2) available for hire by individual members of the general public; (3) that has no fixed schedule, fixed route, or fixed termini." 904 F.3d 208, 214 (2d Cir. 2018).  Though the Second Circuit did not address the NYLL taxicab exemption in *Munoz-Gonzalez*, the standard "articulated in that case is consistent with the New York State Department of Labor's definition for 'driver engaged in operating a taxicab'" which "courts applying the taxicab exemption under New York law" have generally relied on.  *Jihui Zhang v. XYZ Limousine, Inc*., No. CV157440JSAKT, 2019 WL 1220310, at *10 (E.D.N.Y. Mar. 15, 2019).  *See also Munoz-Gonzalez v. D.L.C. Limousine Serv., Inc.,* No. 15-CV-9368 (JPO), 2017 WL 2973980, at *7 (S.D.N.Y. July 12, 2017), *aff'd*, 904 F.3d 208 (2d Cir. 2018) (declining to separately analyze the NYLL taxicab exemption because the parties agreed it is "substantially similar to FLSA's.").

As to the FLSA's taxicab exemption, the parties dispute two key issues.  First, though the parties agree that Defendant Car Service operated some number of taxicabs and some number of

19

private chauffeur services, they dispute whether, under the test set forth in *Munoz-Gonzalez*,
Defendant Car Service operated a sufficient percentage of taxicabs (in contrast to private
chauffeur services) to conclude that it is "engaged in the business of operating taxicabs" for
purposes of § 213(b)(17).  Second, the parties also dispute whether, assuming that Defendant Car
Service is in fact "engaged in the business of operating taxicabs," the term "driver" in the FLSA
exemption means only drivers of *taxicabs* or if it includes drivers of any kind, such as private
chauffeurs, so long as they are employed by an employer that is "engaged in the business of
operating taxicabs."

The Court need only address the second issue.  The Court will assume *arguendo* that the
percentage of taxicabs operated by the Defendant Car Service is sufficient to conclude it is
"engaged in the business of operating taxicabs."  Even so, Defendants cannot seek refuge in the
FLSA taxicab exemption because the Court determines that the exemption only applies to drivers
of taxicabs and that, under *Munoz-Gonzalez*, Plaintiffs were not taxicab drivers.  In any event,
the language of the NYLL exemption is even clearer that it only applies to taxicab drivers, and
thus Defendants were required to pay Plaintiffs overtime under the NYLL as well.

### 1.  The FLSA and NYLL taxicab exemptions apply to taxicab drivers

The FLSA exempts from overtime "any driver employed by an employer engaged in the
business of operating taxicabs."  29 U.S.C. § 213(b)(17).  Based on the text, history, and
structure of this provision, the Court concludes that the exemption applies only to drivers of
taxicabs.  *See United States v. Davis*, 961 F.3d 181, 187 (2d Cir. 2020) (if the "meaning [of
statutory terms] is not clear, [courts] make use of a variety of interpretive tools, including
canons, statutory structure, and legislative history."); *Marblegate Asset Mgmt., LLC v. Educ.
Mgmt. Fin. Corp.,* 846 F.3d 1, 6 (2d Cir. 2017) ("If resorting to the plain text alone fails to

resolve the question, we test the competing interpretations against both the statutory structure . . . and the legislative purpose and history of" the statute. ).

First, although "any driver" is arguably ambiguous in isolation, the natural reading in context of the full textual phrase is that "driver[s]" who are employed by *taxicab companies* are in fact driving *taxicabs*. *See Yates v. United States*, 574 U.S. 528, 543 (2015) ("The words immediately surrounding" a term in a statute may "cabin the contextual meaning of that term.").

Moreover, the legislative purpose of the exemption was not to confer blanket immunity from the overtime requirements to any company that is "engaged in the business of operating taxicabs" – indeed, under the exemption such companies must generally pay overtime to all other non-"driver" employees. *See* 29 U.S.C. § 213(b)(17). Instead, the reason that Congress exempted "driver[s] employed by employers engaged in the business of operating taxicabs" from overtime was to avoid federal clashes with state and local regulations of taxicabs. As the Second Circuit explained in *Munoz-Gonzalez,* because "cities often regulate cab fares . . . and taxi drivers often work more than forty hours," then "absent the taxicab exemption, conflicts between federal overtime rules and local regulations" might arise, for example cities might have to "change their fare caps to keep cabbing profitable." 904 F.3d at 21 (noting that other exemptions in this section of FLSA also work to avoid regulatory clashes in the transportation industry, such as railroads, motor carriers, air commerce, buses, and trolleys). Including non-taxicab drivers in this exemption does not further this purpose.

In any event, even if the taxicab exemption of the FLSA did include non-taxicab drivers for taxicab companies, it is clear that the taxicab exemption of the NYLL does not, since it exempts "driver[s] engaged in operating a taxicab." *See* N.Y. Lab. Law § 651(5)(d).

### 2.   Plaintiffs were not taxicab drivers

Because the overtime exemptions in § 213(b)(17) of the FLSA and § 651(5)(d) of the NYLL apply only to taxicab drivers, the Court must determine if there is a genuine dispute as to whether the Plaintiffs fall into that definition.  As mentioned above, the Second Circuit's definition of a taxicab is "(1) a chauffeured passenger vehicle; (2) available for hire by individual members of the general public; (3) that has no fixed schedule, fixed route, or fixed termini." *Munoz-Gonzalez v. D.L.C. Limousine Serv., Inc*., 904 F.3d 208, 214 (2d Cir. 2018).  *See Jihui Zhang,* 2019 WL 1220310 at *10 (noting that courts apply a substantially similar definition for the purpose of the NYLL taxicab exemption).

It is undisputed that Plaintiffs drove full-time as private chauffeurs for their respective families and that they were driving the families' cars.  The only potential countervailing fact in the record is that Plaintiff Martinez would sometimes drive in some capacity for Defendants in Defendants vehicles during the hours when the Levy family did not need him to drive for them. But this does not alone permit the inference that Plaintiff was "available for hire to members of the general public" *Munoz-Gonzalez*, 904 F.3d at 214.  Without more in the record, no reasonable jury could conclude that the Plaintiffs were operating taxicabs under *Munoz-Gonzalez*.  The FLSA and NYLL exemptions do not apply to Plaintiffs and Defendants were required to pay them overtime.

### E.  Unpaid Overtime Claims

Because Defendants were Plaintiffs' employers and Plaintiffs do not fall within any exemptions from overtime under the FLSA or NYLL, Plaintiffs may bring claims against them for any unpaid overtime.  Under FLSA, employers must pay employees overtime at a rate of 1.5 times the employees' regular rate of pay for any hours worked over 40 hours in a work week.  29 U.S.C. § 207(a)(1).  "To establish liability under the FLSA on a claim for unpaid overtime, a

plaintiff must prove that he performed work for which he was not properly compensated, and

that the employer had actual or constructive knowledge of that work." *Kuebel v. Black & Decker*

*Inc.*, 643 F.3d 352, 361 (2d Cir. 2011) (citing *Anderson v. Mt. Clemens Pottery Co.*, 328 U.S.

680, 686-87 (1946)).

Moreover, as "the NYLL largely adopts the same standard as the FLSA with respect to

overtime compensation," *Fermin v. Las Delicias Peruanas Rest., Inc.*, 93 F. Supp. 3d 19, 43

(E.D.N.Y. 2015), the analysis below applies equally to Plaintiffs' claims for unpaid overtime

under the NYLL. *See Nakahata v. New York-Presbyterian Healthcare Sys., Inc.*, 723 F.3d 192,

200 (2d Cir. 2013) (the NYLL "adopts" the "same standard" for unpaid overtime as FLSA). *See*

*also Euceda v. Preesha Operating Corp.*, No. 14CV3143ADSSIL, 2016 WL 8711446, at *5

(E.D.N.Y. July 13, 2016) ("Courts in this Circuit routinely impose liability for an overtime

violation of the NYLL if it has already found liability under the FLSA's overtime provision.").

### 1.  **Defendants' Liability**

"Whether an employer had actual or constructive knowledge of an employee's unpaid

work is a question of fact." *Lynch*, 291 F. Supp. 3d at 546 (S.D.N.Y. 2018) (citing *Holzapfel v.*

*Town of Newburgh, N.Y.*, 145 F.3d 516, 521 (2d Cir. 1998)).  Here, that question of material fact

is not genuinely in dispute.  While Defendants' formally contest that they knew Plaintiffs were

working more than 40 hours a week, they have failed to do so in any way that a reasonable jury

could reply upon.  The only evidence in the record that Defendants cite to contest that they knew

Plaintiff Vasquez worked more than 40 hours a week is a statement from Defendant Ceballos

that he told Plaintiff Vasquez that he needed to be available for 10 hours a day when he began

working for the Korngold family.  For Plaintiff Martinez, Defendants point only to a statement

from Defendant Ceballos that Plaintiff Martinez told him he was working too many hours and

that Defendant Ceballos subsequently talked to Mr. Levy about reducing his hours.  These statements do not support a conclusion that Defendants' lacked knowledge that Plaintiffs worked overtime.  According to his admissions, Defendant Ceballos was aware that the arrangement between Defendants and the families (which he set up) was for Plaintiffs to work a regular schedule of ten hours a day for five days a week, amounting to fifty hours.  Further, if anything, the statement above regarding Plaintiff Martinez tends to demonstrate Defendant Ceballos' awareness that Plaintiffs were working more hours, not less.

Therefore, the Court concludes that there is no genuine dispute in the factual record that Defendants had actual or constructive knowledge of the fact that Plaintiffs were working overtime.

### 2.  Overtime Hours Worked

Because the Court determines that there is no genuine dispute as to whether Defendants knew that Plaintiffs were working overtime hours, and Defendants admit that they never paid Plaintiffs overtime, the remaining inquiry is determining the amount of unpaid overtime Plaintiffs worked.  In making this determination, the Court does not have the benefit of any contemporaneous employment records, such as time sheets, because as Defendants admit, Defendants did not keep any such records.

The "employer's duty under the FLSA [and NYLL] to maintain accurate records of its employees' hours is non-delegable."  *Lynch*, 291 F. Supp. 3d at 546 (citing *Kuebel*, 643 F.3d at 363; 29 U.S.C. § 211(c)); *Lahcen v. Kiran Park Newsstand Inc.,* No. 11 CV 5998 VB, 2014 WL 3887222, at *4 (S.D.N.Y. Aug. 7, 2014) (noting as to the "non-delegable duty to make and maintain accurate records" under FLSA that the "same standard applies under the NYLL.").  Therefore, "once an employer knows or has reason to know that an employee is working

overtime, it cannot deny compensation simply because the employee failed to properly record or claim his overtime hours," and thus "at summary judgment, if an employer's records are inaccurate or inadequate, an employee need only present 'sufficient evidence to show the amount and extent of the uncompensated work as a matter of just and reasonable inference.'" *Kuebel*, 643 F.3d at 361, 362 (quoting *Anderson,* 328 U.S. at 687) (cleaned up). A plaintiff can "meet this burden through estimates based on his own recollection." *Kuebel*, 643 F.3d at 362.   In an exhibit attached to their motion, Plaintiffs provide calculations of the amount of unpaid overtime based on their estimates of overtime hours worked.

Plaintiff Vasquez estimates that from September 1, 2015 to February 29, 2016, he worked 42 hours a week, then from March 1, 2016 to August 31, 2016, he worked 52 hours a week (with a new salary increase of $1,100), and finally from September 1, 2016 to August 21, 2018, he worked 60 hours a week.  Dkt. No. 86-9.  Plaintiff Vasquez estimates he is entitled to $22,802.38.  Though Defendants formally dispute these estimates, they do not meaningfully draw the amounts into question.  The evidence cited by Defendants, i.e. that Plaintiff was originally told to be available for 10 hours a day, does not have any bearing on whether the amount of hours Plaintiff worked later increased, and indeed Defendants admit that they were told by Plaintiff Vasquez that he was working more hours (and thus they increased his pay). Therefore, the Court determines that Plaintiff Vasquez has demonstrated the amount of unpaid overtime as a matter of just and reasonable inference.

Plaintiff Martinez estimates that for the duration of his time working for the Levy's, he worked 60 hours a week and is entitled to $11,500.00 in unpaid overtime.  Dkt. No. 86-9.  Again, Defendants do not meaningfully dispute that Plaintiff worked 60 hours a week.  To be sure, the parties agree that, once Plaintiff Martinez complained to Defendants about his hours, Defendants

discussed with the Levy's about decreasing his hours. But Plaintiff testifies that the Levy's never actually decreased his hours after that conversation, and Defendants have provided no evidence to the contrary. The Court therefore determines that Plaintiff Martinez has demonstrated as a matter of just and reasonable inference the amount and extent of unpaid overtime.

Plaintiff Vasquez is therefore entitled to $22,802.38 in actual overtime damages[2] and Plaintiff Martinez is entitled to $11,500 in actual overtime damages. The Court discusses below Plaintiffs' entitlement to liquidated damages pursuant to the FLSA or NYLL.

### F. Statute of Limitations

The parties dispute which statute of limitations under FLSA applies to Plaintiffs' claims. Under the FLSA, the statute of limitations is two years, but when an employer's violations are found to be "willful," then the statute of limitations under the act is extended to three years. 29 U.S.C. § 255. "An employer willfully violates the FLSA when it either knew or showed reckless disregard for the matter of whether its conduct was prohibited by the Act." *Young v. Cooper Cameron Corp.*, 586 F.3d 201, 207 (2d Cir. 2009) (cleaned up). Defendants argue that any violations were not willful, and Plaintiffs concede that there is a genuine dispute as to this fact.

However, the issue of whether Defendants' violations were willful, and thus whether a two or three-year statute of limitations applies under FLSA, does not impact Plaintiffs' recovery. As described below, Plaintiffs can recover under either the FLSA or NYLL for their overtime claims but not for both. *See Jiao v. Shi Ya Chen*, No. 03 CIV. 0165 (DF), 2007 WL 4944767, at *17 (S.D.N.Y. Mar. 30, 2007)). Plaintiff Martinez's claims fall within the FLSA two-year statute of limitations, and the NYLL has a statute of limitations of six years and fully covers the relevant time period for both Plaintiffs. Therefore, the Court need not decide the issue of

---

[2] As discussed *infra* III.F, while the FLSA statute of limitations does not cover all of Plaintiff Vasquez claims for unpaid overtime, these claims are fully within the limitations period of the NYLL.

willfulness for the purposes of the FLSA statute of limitations. The claims are without dispute timely under the NYLL.

### G. Liquidated Damages

Because Plaintiffs have established actual overtime damages, the Court must now determine whether to award liquidated damages.  Under the FLSA, when an employer violates the overtime requirements, and employee is ordinarily permitted to recover "unpaid overtime compensation . . . in an additional equal amount as liquidated damages." 29 U.S.C § 216(b). However, if the employer can demonstrate that "the act or omission giving rise to such action was in good faith and that he had reasonable grounds for believing that his act or omission was not a violation of" FLSA, then the Court "may, in its sound discretion" decline to award liquidated damages.  *Id.* at § 260.  The employer "bears the burden of establishing . . . good faith and objective reasonableness" – a burden that "is a difficult one to meet," as "[d]ouble damages are the norm, single damages the exception." *Reich v. S. New England Telecommunications Corp.*, 121 F.3d 58, 71 (2d Cir. 1997) (cleaned up).  Because the liquidated damages are intended to be "compensatory rather than punitive in nature," Courts are to favor double damages and use their discretion to apply single damages only where the employer has clearly demonstrated that they acted objectively reasonably and in good faith.  *Id.* (citing *Brooklyn Sav. Bank v. O'Neill*, 324 U.S. 697, 707 (1945)).  To evade double damages here, Defendant must produce "produce plain and substantial evidence of at least an honest intention to ascertain what the Act requires and to comply with it."  *Id.*

NYLL also provides for recovery in an additional equal amount in liquidated damages, *see* N.Y. Lab. Law § 663(1), and involves the same standard.  "Courts have not substantively distinguished the FLSA's standard from the current NYLL standard of good faith" in terms of

liquidated damages. *Gamero v. Koodo Sushi Corp.*, 272 F. Supp. 3d 481, 503 (S.D.N.Y. 2017), *aff'd*, 752 F. App'x 33 (2d Cir. 2018) (cleaned up). *See Rana v. Islam*, 887 F.3d 118, 122-23 (2d Cir. 2018) (explaining that "in 2009, the liquidated damages provision [in the NYLL] was amended to bring it more closely in line with the FLSA" and as such there are no longer "meaningful differences" between the FLSA and NYLL liquidated damages provisions).

Defendants admit that Defendant Ceballos "knows what overtime is, and has known for a long time." Dkt. No. 90-1 ¶ 67. Defendants also admit that in the past they have had to make private settlements and payments to the New York State Department of Labor due to alleged failures to properly compensate employees, and since then have not made any policy changes at the company. *Id.* ¶ 67-71. Most critically, Defendants admit they never consulted with anyone to determine the proper way to classify and pay employees. *Id.* at ¶ 73. Therefore, no reasonable jury could conclude based on the undisputed facts in the record that Defendants fall within the exception to the general rule favoring liquidated damages under FLSA or the NYLL.

Although Plaintiffs could establish overtime claims under both NYLL and FLSA (setting the statute of limitations issues aside), Plaintiffs "cannot recover twice for the same minimum wage/overtime violations under both federal and state law." *Jiao v. Shi Ya Chen*, No. 03 CIV. 0165 (DF), 2007 WL 4944767, at *17 (S.D.N.Y. Mar. 30, 2007). *See Rana*, 887 F.3d at 123 ("We therefore interpret the NYLL and FLSA as not allowing duplicative liquidated damages for the same course of conduct"). Instead, "Plaintiffs may recover liquidated damages for unpaid [overtime] wages under either the FLSA or NYLL, whichever provides for a greater recovery." *Cid v. J.T. Auto & Body Shop, Inc.*, No. 18CIV9284AJNRWL, 2020 WL 871756, at *5 (S.D.N.Y. Jan. 30, 2020), *report and recommendation adopted,* No. 18CV9284AJNRWL, 2020 WL 871508 (S.D.N.Y. Feb. 21, 2020).

The Court will award liquidated damages to both Plaintiffs under the NYLL because it allows for greater recovery.  Portions of the time period for which Plaintiff Vasquez seeks to recover are outside both the three-year and two-year statutes of limitations provided by FLSA. The NYLL, however, has a six-year statute of limitations, *see* N.Y. Lab. Law § 663(3), and thus Plaintiff Vasquez will be entitled to a greater amount in liquidated damages under the NYLL. Moreover, explained *infra* V, both Plaintiffs are entitled to prejudgment interest under the NYLL but not under the FLSA.  *See Martinez v. Alimentos Saludables Corp*., No. 16CV1997DLICLP, 2017 WL 5033650, at *23 (E.D.N.Y. Sept. 22, 2017) (awarding damages under the NYLL in part because "unlike the FLSA, the NYLL allows for the recovery of both liquidated damages and pre-judgment interest."). Therefore, Plaintiff Vasquez and Plaintiff Martinez are entitled to $45,604.76 and $23,000 respectively in liquidated damages for their overtime claims under the NYLL.

### IV.    WAGE THEFT PREVENTION ACT CLAIMS

In addition to claims for unpaid overtime under the FLSA and NYLL, Plaintiffs move for summary judgment on their claims against Defendants for violations of the Wage Theft Prevention Act.  The Wage Theft Prevention Act generally "requires employers to provide employees with a wage notice containing information such as rate of pay and tip allowances." *Jian Xin Zhang v. Great Sichuan On 3rd Ave., Inc*., 334 F. Supp. 3d 621, 622 (S.D.N.Y. 2018). Section 195 requires an employer to provide certain notices at the time of hiring regarding their compensation, including their rates of pay and whether they are paid by the hour, shift, day, week, or otherwise.  *See* N.Y. Lab. Law § 195.  If an employee does not receive this information from their employer within ten business days of their first day of employment, the employee "may recover in a civil action damages of fifty dollars for each work day that the violations

occurred or continue to occur, but not to exceed a total of five thousand dollars, together with costs and reasonable attorney's fees." *Id.* § 198(1-b).  Additionally, section 195(3) requires an employer to provide certain notices to employees with every payment of wages, including the dates of work corresponding to that payment, rates of pay, etc.  *Id*. § 195(3).  If an employer fails to comply with this provision, the employee "may recover in a civil action damages of two hundred fifty dollars for each work day that the violations occurred or continue to occur, but not to exceed a total of five thousand dollars, together with costs and reasonable attorney's fees." *Id.* § 198(1-d).

As discussed *supra* II.A, Plaintiffs were Defendants' employees for the purposes of FLSA and the NYLL.  Defendants therefore were obligated to provide the required notices under the WPTA.  Defendants do not dispute that they did not provide any such notices to their employees.  The Court grants summary judgment to Plaintiffs on this claim and awards them $5,000 each on both their N.Y. Lab. Law §195(1) and N.Y. Lab. Law § 195(3) claims.

## V.    PREJUDGMENT INTEREST

"Prejudgment interest may be awarded in addition to liquidated damages under NYLL but not under the FLSA."  *Pineda v. Tokana Cafe Bar Restorant Inc*., No. 16-CV-1155 (JPO), 2017 WL 1194242, at *4 (S.D.N.Y. Mar. 30, 2017).  A plaintiff "may recover prejudgment interest only on his "actual damages . . .  under the NYLL, . . . not [his] liquidated damages." *Gamero*, 272 F. Supp. 3d at 515.  Plaintiffs are therefore entitled to prejudgment interest on their NYLL actual overtime damages.

## VI.   ATTORNEYS FEES & COSTS

"Reasonable attorney's fees and costs are awarded as a matter of right to a prevailing plaintiff in an action under the FLSA or NYLL." *Francois v. Mazer*, 523 F. App'x 28, 29 (2d

Cir. 2013) (29 U.S.C. § 216(b)' NYLL §§ 198(1-a), 663(1)).  Moreover, the WPTA also permits

"costs and reasonable attorney's fees" in connection with Defendants' violations. N.Y. Lab. Law

§§ 198(1-b), (1-d).  Plaintiffs are likely entitled to reasonable attorney's fees and costs and may

file a motion accordingly within one month of the date of this Opinion & Order.

## VII.    CONCLUSION

For the reasons stated above, Plaintiffs' motion for partial summary judgment[3] is

GRANTED and Defendants cross-motion for summary judgment is DENIED.  Plaintiff Martinez

is awarded $23,000 in liquidated damages for his unpaid overtime claims under the NYLL and

$10,000 in damages for Defendants' violations of the WTPA.  Plaintiff Vasquez is awarded

$45,604.76 in damages for his unpaid overtime claims under the NYLL and $10,000 in damages

for Defendants' violations of the WTPA.  Plaintiffs are awarded prejudgment interest on their

NYLL actual overtime damages.  Further, Defendants are ORDERED to pay reasonable

attorney's fees and costs to both Plaintiffs.

This resolves Dkt. Nos. 83 and 90.

Plaintiff is granted leave to move for attorney's fees and costs for both Plaintiffs and

prejudgment interest and actual overtime damages within one month of this Opinion & Order.

The moving papers should include a proposed judgment.


    SO ORDERED.

 Dated: March 31, 2021
        New York, New York

_____
     ALISON J. NATHAN
     United States District Judge

---

[3] Although labeled "partial," the Court cannot discern any counts in the complaint unaddressed by the motion.
Plaintiff shall indicate in a letter to the Court within one week of this Order if any matters other than fees and costs
remain to be adjudicated.